Good afternoon. This is the case of Crescenz v. Penguin Group Inc. at USA Inc. et al. number 13-1242. Mr. Haynes and Mr. Schwartz. May it please the court. Good afternoon. My name is Cliff Haynes and I represent the plaintiff and That's fine. I'll try to keep my eye carefully on the time. No problem. This case, as your honors know, arises out of a book, not a newspaper, called The Murder Room, which was a less than successful description of an organ. I want you to know, Mr. Haynes, I had even read the book before. My esteem for you continues to rise. I thought I was going the other way. I won't. Your honor has seen the book and read it and know where the passages are. Why didn't Ms. Crescenz bring a claim against Esquire for the article that described her as Mr. Bender's second wife? Well, because there is nothing, well, first of all, the plaintiff didn't come to me and ask me to represent her in a claim against Esquire. But nonetheless, this will still be a claim or this will still be brought up at a jury trial and there's just so much that, you know, you can imagine jurors who rely essentially on the common sense that we, you know, street sense, they're going to ask themselves all these same kind of questions. They indeed are and I'm prepared to deal with them in front of a jury, which is where I belong. What the court below did was essentially say there is no basis on which you can successfully argue that the defendant was unreasonable under the circumstances. He couldn't have reached further into the right of any litigant to try his or her case in front of a jury. New Jersey has recognized circumstances under which a court can take away the reasonableness issue, but it is... Yeah, let's separate out. One is Mr. Capuzzo, one is Penguin. Which one do you want to start with first? I want to talk about Mr. Capuzzo because Mr. Capuzzo is the writer and the person who is primarily responsible. And I want to talk about it not from this... Was Mr. Capuzzo aware of the email? Does the record show he was aware of the email? I don't recall whether he... I assume Your Honor is referring to the email that went to the publisher saying, hold the phone here, this is not accurate. I object to this. And I don't have a recollection as I stand before you this morning as to whether or not he had specific knowledge of that. I'm sorry, I just don't recall one way or another whether he did or didn't. Okay, go ahead. The court below recounted 15 what it described as undisputed facts. I don't want to quarrel with the court, this court, about whether those facts are disputed. It isn't the facts standing alone that have relevance. It is the inference that one can draw from those facts. For instance, one of the facts that the court relied on was that Mr. Bender was frequently naked in his studio. Another one of the facts is that Mrs. Cressens was referred to as his second wife. Well, I mean, that goes back to the Esquire article. All he's doing is parroting back there what was said earlier. I mean, the issue here is she denies that she had a sexual relationship with the author, Mr. Bender. Yes, sir. She tells Penguin that she has a – she disputes that assertion of fact. Yes, sir. And I guess just to – maybe just to go to Penguin for just a moment, because I would imagine we're going to spend most of our time on Mr. Capuzzo. Sure. What should Penguin have done in that circumstance? Well, they had not yet released for publication the book. They had not released it. How close was it to publication? I think it was within days. It had clearly been – the manuscripts had been prepared. The book was in final form. But it had not been released as of that time. So this was only one sentence, right? I'm sorry? This was only one sentence that she's really disputing? No, it was that whole paragraph that talks about if it's Tuesday night, it must be through all that – you know, what they did all night that ended up with the sex. So is the essence of her claim that it was inaccurate to say that this was a Tuesday night phenomenon? The whole – I guess – Even Bender says that that whole scenario about Tuesday night was not an accurate recounting of any of the events. But Bender says a lot of things. Bender says he never told Capuzzo that he had sex with a woman. That's what he – I guess what I'm asking, I guess, is the email seemed opaque. You know, I was unclear as to whether the email was directly saying, this is a lie. I never had – you know, I never had sex with that man, Mr. Bender. I mean, there's nothing unequivocal about it like that. I agree that there is nothing unequivocal about it. So is the allegation then – so let me just play out a hypothetical. I think a defamation claim could be brought, for example, if there was an admitted sexual relationship, but the challenge was you're mischaracterizing the nature of our sexual relationship. For example, what if it was a once-in-a-lifetime affair that was being portrayed as something that occurred every Tuesday night for a period of years? That could be defamatory, right? Yes. But is that the nature of the claim here, that you're – that I did have an affair with him, but it wasn't every Tuesday night. It was once a month, or it was – No, sir. Then show me in the email where it says, I did not have an affair with Bender. She doesn't say that in the email. Clearly that she did not say that. What she complained to them about was that the description of her was inaccurate with respect to her relationship with Frank Bender. Now, you have to put that in the context of you now have a book that has openly said about someone who is a private figure that she's in an extramarital, adulterous sexual relationship with another married man, a woman who's got a husband who's got two children. Doesn't one's scrutiny of what one is saying about – I was trying to think this morning, when I ever saw in the press a recounting of a story that someone had sexual intercourse with somebody else, that some public official or private person had ever had sexual intercourse with another person. And you don't see that, and you don't see that because this is a subject so extraordinarily sensitive to all of us in society that before you start broadcasting that claim, whether it's in a newspaper or in a book, you better know you're right. But he's not – he didn't start – Capuzzo and Penguin didn't start broadcasting it. It was in the public domain for six years before – Well, in what way was it in the public domain? I'm sorry, Josh. Esquire said that she was his second wife. Well, I think it's pretty obvious to a reasonable juror that second wife means that you're having sexual relations. I'm sorry, but, you know, we're going to have a fight about that, and I'll tell you why we're going to have a fight about that. If you look at the record, and it's in this record, I asked that very question of one of the editors of Penguin, what she understood that to mean, and her testimony was that she understood that to mean that she was the assistant who picked up the things that his wife didn't do. With all due respect – I see. So that doesn't necessarily mean it was a sexual thing. Okay. Judge, one of the things that has happened here – and I'm going to invite this Court not to go down this road – is this is a locker room analysis. You remember in high school the guy in the locker room who said he was having sex with Mary Jo, and everybody came to the conclusion that he was having sex with Mary Jo. He was the quarterback of the football team. He was a really good-looking guy, and Mary Jo was – you know, she dressed provocatively. Therefore, it must be true. That's not evidence. That's not evidence. And no one – and I suspect we were all in one of those locker rooms or fraternity parties or fraternity houses or barracks where that happened. None of us left there and said, now we can publish to the world that Mary Jo and the quarterback are having sex, because we don't have direct information. And that kind of a claim is so highly sensitive, you better be certain there is no evidence, none in this case, that anybody ever saw these two having sex. But – and you have – you have stated the question very well. But here's Penguin now with an email from your client saying that those 12 different categorizations wrongly categorize what took place. And Penguin also has information in the book that – from three sources – Frank Bender, Fleischer, and Walter. Fleischer and Walter are the teammates you just analogized. But Bender – Bender is the partner in this affair, and Bender has said that there was an affair. Now, here's the question. Judge, they have an email from Capuzzo that says Bender is a psychopath. But he's not so much of a psychopath that Capuzzo hasn't put his escapades in a book with his name on it. Here's my question as to that framework, because that's the issue we have. Based on that, you know, three sources, one email. Okay. Has – has Cressence established by a preponderance of the evidence that the other three were lying? Judge – And isn't that really the standard? Isn't that really the standard the court – Let me try this with – let me try this with the court. Can you close your eyes and see Joan Cressence? You can't, because you don't – yeah, she hasn't been in front of you. She wasn't in front of Judge Hillman. Critical to the – this is he said, she said. I understand. And critical to he said, she said is credibility. And the only way you can determine whether or not Joan Cressence stands tall and says, I don't care what you want to infer from all of the things that Frank said, I did. You are wrong. I did not have sex with that jury. And I'm not – I'm not trying to convince your honor that I win. I think I can do it. I'm not trying to convince your honors of that at all. You don't have to do that. I'm trying to convince your honors that I have the right to stand in front of 12 people and say, this is a locker room. It was a locker room that Frank Bender loved being in. He sucked these people in with him, and they went along for the ride. Every single – not one had any evidence that they had sex. There isn't one person who said, I saw them have sexual intercourse. I was in a room. This is supposed to be an open relationship. Everybody's running around naked. Where are all the people who came in and saw them having sexual intercourse? They don't exist. You want to put her on the stand so she can testify, I did not have a sexual relationship with Frank Bender. I've already done that. She's testified to that. Where in the record does it say that? I can't – that she did not have sex with Frank Bender? It's not that complicated. She said it repeatedly. I'm sorry. I'm a little taken back by your honor asking me that question. It is in her deposition. No, prior to publication, where is the statement to Penguin or Capuzzo, hey, you better not publish this lie that I had a sexual relation with Frank Bender because it's not true. Judge, she had no way of knowing that Frank Bender was writing that kind of story. Frank Bender – I'm sorry. Capuzzo. Capuzzo never asked her that. I thought the email came after she saw the galley. It came after she was given a copy of the galley. That's true. That's the first time she saw it. It's within 30 days. Michael Capuzzo took seven years to write this book. He was interacting with Frank Bender for seven years. He never laid this topic before her. He never said, look, all these people are saying that you were sleeping with this man, that you had a sexual relationship with him. I'm about to write that. That's pretty highly charged stuff. Before I put that in writing, let me put it in front of you. Did you or did you not? That never occurred. Let's go back to my question. Let me frame it another way. At the point they had the email, they're on the eve of publication, why was Penguin unreasonable in the face of the clear statements from three other people when all the facts contained therein? Why were they unreasonable under New Jersey law and moving forward with the publication of the book? Judge, my argument remains the same. When you look at statements, they are not all equal. Some rise above others. We've got an accusation here not of sexual intercourse, accusation of adultery. My client is supposed to be a practicing Catholic. She's married. She's got young children. You're going to write this story about her. My position is that your duty is kind of like the common carrier. It rises higher. Now you've got someone saying who is putatively, intimately involved in some way with one of the protagonists of this book, if the book had a protagonist. You've written about her in 15 places. You've written about her having a sexual relationship, and she has said to you what you've written to me is not true. Now, was it necessary for her to say the specific is as follows, not to raise their level of concern and consciousness? I would submit that... So what should they have done next? They should have held the galleon. They had her email address. Okay, and they sent her an email back and said... Be specific. What are you talking about? Be specific. Did you or did you not have sex with Mr. Bender? And she said, I did not have sex with Mr. Bender. Now what are you going to do? What do they do? Now what are you going to do? Isn't that what Judge Hillman found? He even assumed that if they had asked that question, her answer would have been no. I didn't read Judge Hillman as discussing Penguin at all. I read him as discussing Capuzzo. You're missing the point of the question. If they had asked her beforehand, and she had denied the relationship, would Capuzzo have been negligent nonetheless for publishing? Or Penguin. Capuzzo or Penguin. My answer is an unequivocal yes, that they would have been negligent for releasing the book. You mean Capuzzo couldn't say... They later... ...that there was all this other information, and from that I make the deduction, in my opinion, that there was an adulterous relationship going on here. You and my opponents can make that argument to the jury, and I've got the burden of proving that to a jury. But I have... Judge, I don't accept the inferences. The court drew all the inferences against me. Every one of them against me. She stayed in his house, therefore. Therefore what? Therefore they were having sex? There was a host of other things. That may mean nothing, but Bender under oath saying they had an affair, an Esquire article saying she's a second wife, them visiting Capuzzo and staying in a hotel room, one room with one bed. So the quarterback... There is a cumulative aspect to this case, is there not? I mean, if it's a he said she said where Frank Bender is boasting to some sexual exploit and Cressens is saying that's just not true, it's a very, very different case than the case with the 14 facts that we have in front of us. I don't know what analogy I can draw with the court. An accusation of rape when it's not true and you have to defend against it because a lot of people say it. You know, the quarterback says, oh, yeah, I was having sex with Mary Jo, therefore the story is confirmed. I mean, this is how rumor turns into fact when you have only a portion of the story. Had someone, anyone, any evidence, anywhere that Joan Cressens said this to some... Fleischer doesn't say, well, she said it to me. No one puts it on her. It is all on Bender, this guy who is a psychopath who is... When you make this accusation against... You're making an accusation. Mr. Bender was a psychopath? No, sir, I'm not making that accusation. That's Mr. Capuzzo's accusation. Mr. Capuzzo wrote an email to the publisher saying he was a psychopath. That was his accusation. Those were his words, not mine. All right, why don't we get you back on rebuttal. Let's hear from Mr. Schwartz. Good afternoon, Your Honors. Just to jump very quickly to the psychopath issue. The psychopath issue is covered at the record on page 392. In fact, the statement was, in an email from Mr. Capuzzo, that Bender was psychopathic in his meddling with trying to get a copy of the transcript. So the issue, and it's at page 392, and it's a fairly interesting portion of the transcript, because Mr. Haynes then asked Mr. Capuzzo, well, you don't like the word, would you reconsider saying it? And the witness says, yes, I'd rather... I would say enduring the constant meddling of Bender. The context of the one time when Mr. Capuzzo used the word psychopathic was psychopathic meddling. This was when Bender, and this is in the record, 392 to 393, Bender was frustrated that the book wasn't published yet. Bender, according to Capuzzo, was hungry for money, he needed some more money, and Bender was giving Capuzzo a very hard time. Capuzzo then said, and he regretted the word in the transcript, he said, it's Bender's psychopathic meddling in the issue of publication. In one sense, that's irrelevant as to where we are today. What cases have you found that grant summary judgment in a private figure, private concern defamation suit on the issue of negligence? I'm sorry, I couldn't hear the last one. Issue of negligence? What cases support the granting of summary judgment in a private figure, private concern defamation suit on the issue of negligence? I don't think there is a direct case that says or a direct case that held there was a private, private and summary judgment. But New Jersey law clearly says that in defamation cases, summary judgment is permitted and, in fact, encouraged, and the reason for that is because of the First Amendment implications. It's rare. You concede it's rare, though. Yes, of course it's rare. Your argument is this is the rare case. Exactly. And, in fact, of course, the private, private, private person, not of public concerns or private concerns, are very rare cases indeed. So you don't find that many. We, of course, allege that she is at least a limited person. The court didn't decide that. Are we putting all that aside? The court didn't decide it. Also, it was a throwaway briefly, like a footnote in your – did you even bring it up in a – you brought it up in your reply in the district court? Yes. Or did you? Or was it just a reply to us? It was basically a throwaway line that she might be a limited-purpose public figure. Oh, no, no. It wasn't a throwaway line by us at all. We've always maintained she's a limited-purpose public figure. How in the world – to do that, you have to thrust yourself into the – publicly into, you know, Bender's affairs. Now, I'm not so sure she thrust herself into the public domain on any of this. Well, that's an interesting question. The law in New Jersey concerns or deals with a matter of public concern, which is a much more sensitive issue than the general federal law. Well, this is not a public concern, is it? I mean, is it public that she might be having an affair with Mr. Bender? That's not a public concern. No, but Mr. Bender's life is a matter of public concern. Don't forget before – But then she has to make the effort to put herself into the picture there. Exactly. And so the example would be, and there are cases like this that say the wife of a public – the wife of a publicly elected official might be a public figure. The most famous case with the wife of a public person is the Johnny Carson case, and his wife was held to be a public figure. That's not availing to you here, though. Oh, I think it may be. I mean, the district court applied negligence. So if you're going to prevail here, it can't be on that ground. No, no, no, no. The question was would we think that she is a public figure, and we do think that the case is much more favorable for them under the negligence standard. And so that's harder for us in a sense. But, of course – All right, let's focus on the negligence standard. Why – when did Mrs. Cresson deny the affair? Well, I don't know that she ever actually denied the affair. She sent an email, but the email is opaque or it's not exactly – What about her deposition testimony? In her deposition testimony, she said she never had sex with Frank Bender. All right. So to that extent – So you concede that she's denied it. Oh, yes. But your argument, I guess, is that that was post-publication. Exactly. And – What about pre-publication? Are you saying that she never denied having sex with him pre-publication? Correct. She never denied it. And Judge Hellman, on favorable for them, assumed that if asked, she would deny it, and that for purposes of the motion, she denied it. Yeah, but, you know, that's – those are the facts. Mr. Haynes doesn't really disagree with those facts. The question is the standard. And the question is here whether or not in a negligence case, and this is the way the district court looked at it, and that's what we have. Under these facts, did the publisher – let's stick with Penguin for a second. Did the publisher have to do more? What would a reasonable publisher do? And, in fact, the publisher, Mr. Slinker and – Schenker. Schenker. Others who were alluded to in the chain expressed concern. They had some subjective concern about the contents of that e-mail. Yes, Mr. Schenker sent the e-mail up to Mr. Gigante. This is in the record of page 1017 is where the e-mail first comes into play, the full portion of it. It's – the fairest way to describe it at first reading is she's unhappy with the characterization in the book. As we've – as we say, most people are unhappy with the characterizations in books. That's why most publishers don't give out the transcript or the manuscript of the book to people who are mentioned in the book. Okay. Let's stop right there. So they made a decision after that, and there's the question of the attorney-client privilege here, which we don't have to get into, but that's out there. They made a decision that we're going to publish this book. Well, the decision is expressed in – at the record of page 1023 in Gigante's response to her e-mail. Gigante is the senior VP for legal affairs at Penguin. He read her e-mail. So this is not a question of – the question of attorney-client privilege was when Mr. Haynes asked Mr. Schenker, what did Gigante, the lawyer, say to you when he said attorney-client privilege. It's not attorney-client privilege, obviously, when he writes to her. He writes to her, you're unhappy with the characterizations in the book. We stand by them. Okay. She sent another e-mail, you know, very high-strung, but doesn't deny having sex. The essence of their decision and the essence of your argument is, look, we had enough observations on the other side that notwithstanding the e-mail, we're entitled to have summary judgment granted in this case. Exactly. Whereas Mr. Haynes says, no, no, you made a calculated business decision that based on the observations of others and based on the content of the book, notwithstanding her protestation, we're going to go forward. And shouldn't the question of whether or not that conduct was reasonable or unreasonable lie in the hands of a jury? No, we don't think so under the facts of this particular case, because a judge in the first instance, a district court judge in the first instance, has the duty to see if there are enough facts to even raise the level of presenting the case to a jury. So Mr. Haynes, for example, is using the locker room analogy. But it's not just rumor, and I believe the record is completely clear, and it's at Capuzzo's declaration. It's at page 160 of the record. Capuzzo submitted an affidavit in support of the motion for summary judgment where he describes Bender and Crescenz going up to his house. They meet, they chat. Capuzzo says, would you like separate rooms in my house? He says that Bender says, no, we're going to go to the motel and stay in a room together. She doesn't deny this. Her quibble is, Bender didn't ask, Capuzzo didn't ask me. He only asked Bender. Nonetheless, she doesn't for a second say, I didn't go there or I didn't sleep in the same bed with Mr. Bender. There are certain... Well, nobody asked her. There's an assumption there as to what happened. Oh, I think that's very incorrect. And in theory, Bender could have been lying or joking when he said we're going to go to the motel up the street and get a room. But Capuzzo observed them. He saw them go there, and then they had breakfast the next day. That's not... But are you saying that that one episode is enough, or are you saying the cumulative weight of these 14 items is what affirms the district court? Yes, certainly the cumulative effect of the 14 items is certainly enough to support... What if there were only seven of the items? That's one thing that's troubling, right? Because where do we draw the line as to what a rational juror could conclude? You'd have to see what is the evidence presented from the other side, from the plaintiffs, to show that Capuzzo acted negligently prior to the publication of the book. The law is absolutely clear that a publisher or an author is entitled to present one side of an issue. We don't have to give her version of it. In fact, during the case I... But the cases you cite are actual malice cases on that. But there's no... You say the law is clear. The cases are actual malice cases, not negligence cases. But I don't think that makes a difference at all. There's no requirement... Well, it's a different standard. But there's no requirement under the law for a publisher to present both sides of an issue like this. You're essentially saying that her email doesn't create a genuine issue of material effect. That's what you're saying. It doesn't create a genuine issue of material effect. Absolutely, because she... That's what you're saying. Exactly. But to get there, you have to discredit her email. No, I don't think so, because Judge Hillman gave it full credit. But he said that even... He said we are... He assumed for purposes of this motion that they did not have sex and that everything that Bender said was false. She still can't win because we acted reasonably in believing what we saw and what we knew. The truth of falsehood... But someone else may disagree with Judge Hillman. And I'm not saying us. The point of the matter is, doesn't the standard on reasonableness and the standard on whether or not a material fact may be genuine or not genuine, isn't that... Particularly when you have a genuine dispute as to issue of material fact, doesn't that make it a jury issue? The answer has to be yes, theoretically. Theoretically, yes. I mean, you've got to say yes. But it's different. What you're saying is there was no genuine issue of material fact, that it was false. That's different from whether it was negligent. The truth of whether or not they slept together has no bearing on whether or not the author or Penguin acted reasonably or, to put it another way, acted negligently. The standard is, did we act negligently in determining the falsity of the statement? Prior to publication, there was not one fact to suggest in any way that they did not have a sexual relation. All the facts go the other way, the 14 or 16 different factors which Judge Hillman took into account. So the question is, was there any indication that we should have had substantial doubts, which is the standard, of anything that Bender, Walter, Fleischer, Bender's daughter, Bender's adult daughter had no cause for alarm, did not ever alert us that anything that was said in the book was false, with reference to Joan being the second wife, with reference to Joan having a long-term affair with him. So there was no fact any place in the record, up, down, any place, to suggest that the statement that they were having an affair was false. It may be false. We'll never know, and that's what Judge Hillman said. We'll never know. I guess the question, and you framed the question correctly. I mean, but doesn't the question really become whether or not the email triggered a duty to investigate? Yeah, and let's, I'll deal with Penguin for just a moment. There's three restatement factors that talk about time, nature of interest, and the extent of the damage. The time when Penguin received Grishenza's email, were the books already printed? You said no, they were almost. I guess they were printed. They were printed. Would it have been impossible to delay publication? Nothing is impossible. It could have delayed, certainly we could have delayed publication, but it was reviewed by the highest legal officer in the company who knew of the factors that were mentioned prior to publication, while supporting the belief. Was Mr. Capuzzo noted? Was he told at the time that she had sent this email? Yes, if you see again at the record on page 1023, I think the second response, I think from Giganti says, I'm not going to get in a war with you, meaning Grishenza's not going to get in a letter writing campaign with you. I know you're objected to the book. I'm going to leave it to the author whether or not he wants to make any changes. And Capuzzo, and this is also in the record, Capuzzo said, I have nothing against Jonas. Change her name. So her name was changed, not in that book, which was already printed, but in the second edition and all the paperback editions, her name was changed. Judge Hillman noted that, and that's actually one of the things that Mr. Haynes said is something that was improper. But that's just a fact. It had nothing to do with the grant or denial of summary judgment. That's just a fact. That at the time, Capuzzo did know about the Crescenz letter. He still supported his view based on his seven years of observation. What would have stopped Capuzzo from just checking with her? And he could have said, among other things, I see you've sent this email, but it's not an out-and-out statement that you didn't have an affair with Mr. Bender. Explored it further. Why didn't he do that? He didn't have to do it. It wouldn't have made a difference. We are assuming that if we asked her, she would have denied it. The law does not require anything on our side to be done just because she denies it. And Judge Hillman really dealt with that very well at footnote 11. He said, another way of looking at this issue is to assess the effect the mere denial would have on the free exchange of ideas and opinions. We talked about that with Mr. Haynes. What about the nature of the interest? What was the interest in publishing this information about Ms. Crescenz? It tied into the story of Mr. Bender. Mr. Bender's very... I understand it ties in, but other than the salacious effect of somebody reading that this guy had a long-term relationship, a sexual relationship with his long-time secretary. What's the interest in publishing that? Especially if she denies it. Because if you... Capuzzo said, I observed, and this is in his affidavit, I observed Bender over a period of seven years. He is this flamboyant guy  a bohemian lifestyle. Open marriage, very sexual, and all that sort of stuff. Understood, and now we're talking about her. Yes, she participated in that. It was Capuzzo's judgment based upon what Bender said to him that he couldn't do what he did, creating these sculptures and dealing with horrible, horrible crimes and seeing dead bodies and all these awful things without Joan. In Capuzzo's mind, he's portraying a picture of Joan as essential to Bender's life, as essential to his personality. Bender says, and this is in the book, and it's in the affidavits, that his expression was, I download the horror. He partied with Joan. That's the purpose of it. I have nothing to do with being salacious. I mean, everybody's an adult. Nobody... I doubt that anybody at Penguin and I doubt that Capuzzo ever gave a tenth of a second thinking that it would sell more books to describe Joan as having a sexual relationship. Or more reason to be very careful with regard to this because the... of having infidelity in that person's marriage. Based upon seeing her staying in the hotel room with him, not just at Capuzzo's house, but in Manlius when Bender goes up to get an award, they go there together. He doesn't go with his wife. She doesn't go with her husband. They go together. But there's an easy way to deal with it. You can set out all the facts and let the reader draw the conclusions. I think the reader draws the conclusion that they were having an affair. But Capuzzo then makes the conclusory statement or conclusion that they were having an affair. Yes. And she denies it. So why not just say that you have these 14 items and you can make your own conclusions. You could probably say it would certainly be an uphill battle for her to say otherwise, but he doesn't really know. He does not really know. Of course. In the phenomenological sense, whether she had an affair with him or not. That's correct. But that's not the ultimate question. The ultimate question was was he negligent in saying that they did have an affair. Furthermore, during the deposition of Miss Crescenz, I asked her. And was Penguin negligent in publishing the book, even though she alluded that she didn't. I asked her, I said, if we had included a denial in the book, would that have satisfied you? She said no. She said no because you have no right to publish a book about me without my consent. And she's wrong about that. And that goes to very strong First Amendment issues. I got that one. Okay. Anything further? No. Okay. Thank you very much. Thank you. We'll get Mr. Haynes back on rebuttal. At page 405A of the record, Mr. Capuzzo testified that he had seen the email. I wanted to bring that to the court's attention because I didn't recall that. I went back and I read the email. And with all due respect, I think there is an outright denial of sex with Mr. Bender. She says, and this is on page 1018A, she refers to page 46, second paragraph, quote, and girl Tuesday night when she made love with my clockwork in the artist's house, end quote. Quote, but she was bitterly jealous of the many lesser girlfriends, end quote. This is unbelievable. That's it. It's totally unbelievable and did not occur. That's what she says. What did not occur? I would infer from that that the Tuesday night she made love like clockwork did not occur. She did not make love like clockwork on Tuesday night. We can parse those words. And again, these are jury questions. They cannot arbitrarily, you can't arbitrarily say, Mr. Haynes, your inference is that nothing happened or wrong. That's for the jury to determine. Mrs. Crescens testified that she was not physically attracted to Mr. Bender. Never was physically attracted. Mrs. Crescens testified that she slept in the same bed as her brother when they went on ski trips. And she said, that doesn't mean we were having sex. Those inferences have to be drawn in my favor at this juncture. You cannot. Mary Jo's girlfriends don't say, you're right, she's sleeping with everybody. Nobody on my client's side of the aisle. And I'm talking about, no one says anywhere that Joan Crescens admitted that she was having sex with Bender. None of evidence of that. And absent an admission, it was defamatory. Absent an admission by your client that she was having sex with Bender, it's a jury question. No, I don't think I said that. Absent something more than innuendo and speculation. If somebody said, I saw the two of them having sex. If someone said, Joan Crescens told me she was having sex. The people who said they saw them could be lying. They could be. So you think that's enough? They could be. But you asked me whether or not the denial in and of itself was enough. I don't think it gets me over the hurdle. I think there are lots of other things. What evidence do you have pre-publication on your side? They posit, we've got these 14 things and you're quite right. There's no direct evidence of inflagrante delicto here. It's all circumstantial evidence. Including an admission by the other party. But what do you have of a circumstantial nature or a direct nature on the other side of the ledger pre-publication? Joan Crescens was happily and successfully married. She was a responsible... I mean from the record. It's in the record that she was married. Pre-publication. Judge, this wasn't an issue pre-publication. She had no reason to believe that people were... that somebody was saying... She saw what was going to be written about it. She had every reason to... And the minute she saw it, she wrote the email and said, this did not occur. This is totally unbelievable. So we have the email. It really... Your claim to get to a jury rises or falls on that email. Not with respect to... I disagree with respect to Mr. Capuzzo. Mr. Capuzzo one and one made four to him. He drew all the locker room negative inferences that he had no right to draw if he was going to publish this story. Keep it to himself. He can think that all he wants. One through fourteen led him to the conclusion that they were having an extramarital affair. Judge, one through fourteen... I'm just telling you what... whether it's true or not, that's what led him to that conclusion, correct? I don't know that. That's what led the judge to that... That's what he says in the book. That's what led the judge to that conclusion. I don't know that one fourteen is what led Capuzzo to that conclusion. And some of those conclusions make no sense. I think maybe Judge Fischer alluded to this. It isn't so much whether it was true or not. One through fourteen led the author to the conclusion that they were having an extramarital affair. And the question then becomes is it negligence for the author to make that... to leave that in the book and for the Penguin to allow that to be published knowing beforehand that somebody disputed at least a substantial aspect of what was being said. And... It's not a question of truth or not. It's a question of whether they're negligent in allowing it to go forward. And that gets back to the issue of whether the jury gets to decide what constitutes reasonableness and due care under the circumstances. This is an allegation that is going to, and did, ultimately go back to her children that she was having this as a sexual affair. And my position is if you are going to make those kind of statements you better be paying children's rights. Let's just run back to negligence. Negligence is you have a duty of care, you have a breach of the duty of care, that there was an injury, and that the cause of that injury is the breach of the duty of care. Yes. Okay. What was the duty of care would you suggest in this case? The duty of care was in the context of this allegation to verify. You know, verify is a very important word in the social order. It's impossible. It's impossible to verify. You can't turn back the clock and go back to the studio on Tuesday nights. You can't go to see if the hotel room that they actually went to and actually stayed in. It's unverifiable. So let's try again. I regret that you see things that way, Judge, to this extent. Let's start again. What's the duty of care? Because it isn't so much to verify, because they're not going to be able to tell you the truth or not. I mean, that's part of the point. The duty of... Go ahead. Tell us what the duty of care is. The duty of care is to act reasonably under the circumstances. To act reasonably under the circumstances putatively, the wife knew about this, putatively the daughter knew about this. There's no evidence that any of those people were asked whether there was a sexual relationship between Frank and his wife. His... And the duty of due care is defined by the circumstances. He's got to do more than rely on the likes of Frank Bender. He doesn't... I don't know what Fleischer said to him. I don't know what... We don't have any record of what they said to him. We don't know that he said, yeah, I heard that too. Let's just back up for a second. Isn't the duty of care not to publish an untruth about an individual without facts to back up the statement made? You said it better than I did. Okay. Yes. If that's the case, then there were facts that could lead the author to the conclusion that there was an affair and it would seem that that would be game, set, and match, whether it's true or not, because Judge Hardiman's right. None of us really know if there was an extramarital affair, but the duty is not to publish an untruth about an individual without a basis for making that assertion. Go ahead. I think you are now crossing into issues of credibility. No, I said that before. You agreed with me that that's the duty of care. Pardon me? I said that. I just repeated what I said to you before, and you agreed that that was the duty of care. And I did agree with the duty of care, with your representation of what the duty of care is. Where we disagree is whether or not he was reasonable in approaching that under these circumstances. But it does make, it makes our job easier, because he doesn't have to be correct in the pure philosophical context. He has to be, he has to make an assertion, and he has to have reasons to make it. And if he does have reasons to make that assertion, then it would appear that it's not negligent. He has to have reasonable reasons, judge, not just reasons. It's not good enough to say, well, they were at the inn of the dove. That proves that they were having sex. No, what he said was that he made some strong comments, but it was based on a whole host of factors, including, and some of which were his personal observations. But all, none of, because they're a whole host of facts doesn't mean they cumulatively add up to anything. It doesn't necessarily mean that they're true, but for purposes of us who are removed from this, can we say it was negligent for that person to have made those, made the conclusion based on those particular factors? Well, I would ask you not to do that. I'm just, I'm asking. I'm not a fan of motions for summary judgment for this very reason. We created this system. I'm on record as not being a fan of summary judgment. But the question is, it happens and when is it appropriate to allow it? And you've got a judge here who's, you know, got a great reputation and, you know, I'm not saying we don't make errors, but you've got to show that either Capuzzo or that Penguin were negligent and that their material issues of fact pertaining to their negligence allow this to go to a jury. Judge, as I understand it, there are three sources of the information that they were having a sexual relationship. Those three sources are Bender and his two compatriots. They have no other source. And Capuzzo's observations. They have no other source that I'm aware of anywhere. I mean, if you are going to credit, well, he ran around his... No, no, no. We're talking about Capuzzo's observations that he offered them a place to stay at his house and they said they would go to a hotel. A motel that had, you know, they stayed in one room with one bed. I don't think that Capuzzo knew that at the time. That's subsequently developed information. I don't think Capuzzo had an idea one way or another about that. He didn't know that they were in a hotel in one room and one bed. That's something that the defense has developed in this case. There's nowhere in the record that Capuzzo knew that at the time that that occurred. An awful lot of this stuff has been created since the time. I've said to you from the outset, none of us know that this did or did not occur. The question is, is it negligent for someone to make an assertion? He's saying, and the Penguin is saying, that he based it on X number of facts. Let me ask you, Your Honor, to look at this a somewhat different way. Because there's very little in the record that suggests that Mr. Capuzzo spent much time with Joan Crescent at all. Talking about much of anything. The least of which is her and where she was coming from and exactly what was going on here. All of his observations about her are his inference. Not as a result of his talking to her. Not as a result of this. He doesn't say, well she said this about their relationship, which leads me to believe that they were in fact having an affair. That kind of thing isn't there. Authors in books that are nonfiction make inferences based on facts all the time. The question is, were the or make deductions based on inferences from facts. Where was Mr. Capuzzo negligent here? That's all I'm asking. This is a theoretical question. It's a theoretical issue  He was facing perhaps the most sensitive topic imaginable to a woman. That is her personal sexual relationship with another man, particularly a married woman. He was making accusations against a woman about whom he knew little and was not writing that was damning to her, not necessarily to Bender, but damning to her his duty. Agreed. There may have been an injury here. I don't know. But clearly it was one where she may have had her reputation a knock against her reputation. The question then becomes when the author does this knock against her reputation was the author and the publisher negligent in allowing those statements to be made? And I've tried to argue that there is sufficient evidence from which a jury can reasonably conclude that there was a breach of the standard of care. At this point we're going around in circles, but is there anything further you want to, we'll give you one more minute to conclude if you want. No, Your Honor. All right. Thank you very much. Thank you to both counsel. Take the matter under advisement.